UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JUSTIN LINDSEY, *et al.*,

        **Plaintiffs,**

  **v.**                            **Case No.: 2:15-cv-3065**
                                        **JUDGE GEORGE C. SMITH**
                                        **Magistrate Judge Kimberly A. Jolson**

TIRE DISCOUNTERS, INC.,

        **Defendant.**

## OPINION AND ORDER

This matter is before the Court upon several motions: (1) Defendant Tire Discounters, Inc.'s ("Tire Discounters") Motion to Decertify the Conditional Collective Action ("Motion to Decertify") (Doc. 68); (2) Plaintiffs' Motion for Class Certification under Federal Rule of Civil Procedure 23(b)(3) ("Motion for Class Certification") (Doc. 69); (3) Tire Discounters' Motion for Summary Judgment ("Motion for Summary Judgment") (Doc. 79); (4) Plaintiffs' Motion for Partial Summary Judgment on the Method of Calculating Damages ("Motion for Partial Summary Judgment") (Doc. 80); and (5) Plaintiffs' Motion for Leave to File a Supplemental Brief in support of their positions on the Motion to Decertify and the Motion for Class Certification ("Motion for Leave to File Supplemental Brief") (Doc. 95). All five motions are fully briefed and ripe for disposition. For the following reasons,

(1) Tire Discounters' Motion to Decertify is **GRANTED**;

(2) Plaintiffs' Motion for Class Certification is **DENIED**;

(3) Tire Discounters' Motion for Summary Judgment is **DENIED**;

(4) Plaintiffs' Motion for Partial Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**; and

(5) Plaintiffs' Motion for Leave to File a Supplemental Brief is **DENIED**.

## I.     FACTUAL BACKGROUND

This case arises out of Tire Discounters' classification of its Service Manager position as exempt from the overtime provisions of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA") and the Ohio Minimum Fair Wage Standards Act, Ohio Revised Code Chapter 4111, *et seq.* ("OMWA").  Named Plaintiffs Justin Lindsey and Matthew Titus worked as Service Managers ("SMs") at various Tire Discounters locations for all or part of the period of December 8, 2012 to October 31, 2016.  (Doc. 1, Compl.).  Plaintiffs claim that Tire Discounters improperly classified them, and all other SMs employed by Tire Discounters around the country during this time period, as exempt under the executive exemption provided by 29 C.F.R. § 541.100.  (*Id.*).

Tire Discounters is a chain with over 100 stores throughout Ohio, Kentucky, Tennessee, Georgia, and Indiana.  (Doc. 68-1, Ward Aff. ¶ 3).  For its first several decades in business, Tire Discounters focused primarily on retail tire sales and simple services such as changing and rotating tires.  (*Id.* ¶ 8).  During this period, each Tire Discounters location was staffed with a General Manager ("GM") who typically oversaw an Assistant Manager ("AM") and several Tire Technicians and Service Technicians.  The AM position was not classified by Tire Discounters as exempt from the FLSA's overtime provisions.  (Doc. 77-1, Ward Dep. at 8).

### A.     Creation of the Service Manager position

In 2010, Tire Discounters decided to expand both its number of locations and the services it offered to include work on brakes, shocks, struts, oil, fluid exchanges, and air conditioning. (*Id.* ¶¶ 5–9).  This expansion required Tire Discounters to restructure its staffing model.  The

2

non-exempt AM position was eliminated in 2012 and, at the same time, two new positions were created: a non-exempt Sales Associate position and an exempt SM position.  (Doc. 77-1, Ward Dep. at 7–9).

Tire Discounters determined the new SM position fell under the "executive exemption" from the FLSA overtime regulations, which requires, *inter alia*, the employees in question to receive a salary of at least $455 per week and have "management of the enterprise" as their primary duty.  (*Id.* at 274–75; 29 C.F.R. § 541.100).  There is no dispute that all SMs received a salary of at least $455 per week at all times.[1]  Tire Discounters' written SM job description emphasizes the management aspects of the position, stating that SMs are "primarily responsible for developing, directing, and supervising a team of Service Technicians and Tire Technicians" and listing the following "Key Accountabilities":

- Supervise service technician and tire technician staff.

- Evaluate the performance of service technician and tire technician staff.

- Assist in the hiring, discipline and termination of shop staff.

- Monitor and manage the workflow in the bays and keep sales staff informed on waiting times.

- Enforce all safety policies ensuring all safety goggles are worn, proper clothing is worn and all employees are working in a safe and clean environment.

- Ensure continuous and consistent enforcement of all Tire Discounters policies and procedures.

- Build and maintain a team effort consistent with the goals of the company.

- Exercise strong, fair and consistent leadership with all employees.

---

[1] Although named Plaintiff Lindsey recalled receiving only $450 per week, Tire Discounters' records demonstrate that he was in fact paid more than $455 per week during his entire tenure as an SM.  (Doc. 68-4, Deposition of Justin Lindsey at 45–48; Doc. 79-1, Pay Records).

- Meet or exceed Tire Discounters Performance Standards for quality and speed of service for our customers.

- Ensure all diagnostic procedures are followed and appropriate recommendations are given to the customers.

- Enforce with all employees that the customer is our highest priority so that our integrity will never be questioned.

- Ensure every vehicle has been inspected for needed services.

- Ensure customers are satisfied with the services performed.

- Assist at the sales counter as needed.

- Maintain cleanliness and care of every customer vehicle.

(Doc. 68-2, Service Manager Job Description). Tire Discounters also had the SMs undergo a full-day training program to make sure the SMs had a uniform understanding that these "key accountabilities" were their primary duties. (Doc. 68-1, Ward Aff. ¶ 30).

**B.      Department of Labor investigation**

In 2014, an SM employed by Tire Discounters in Louisville, Kentucky made a complaint with the Department of Labor ("DOL"). This SM alleged that he had been improperly classified as exempt and was entitled to unpaid overtime wages. (Doc.68-3, Compliance Action Report at 2). The DOL investigated but was unable to substantiate the allegations of improper classification. (*Id.*).

**C.      Re-classification of Service Manager position as non-exempt**

In 2016, the DOL announced a proposed change to dollar threshold of the weekly salary required for the executive exemption. 81 FR 32391-01. The final rule was set to go into effect on December 1, 2016, and would have raised the minimum weekly salary for exempt employees to the 40th percentile of earnings of full-time salaried workers in the lowest-wage Census

4

Region.  *Id.* at 32393.  Thus, as of 2016, the final rule would have raised the weekly salary requirement from $455 to $913.  *Id.*

In anticipation of this rule change, Tire Discounters had the choice of either raising the SM salary to meet the new exemption threshold (which, in many cases, would have meant increasing SMs' annual salaries by $15,000 or more), or re-classifying SMs as non-exempt from the FLSA's overtime provisions.  Tire Discounters opted for the latter and all SMs were reclassified as non-exempt as of October 31, 2016.  (Doc. 77-1, Ward Dep. at 98).  Tire Discounters did not implement any changes to SMs' job duties in connection with the reclassification.  (*Id.* at 116).

## II.  PROCEDURAL HISTORY

Plaintiffs filed their Complaint on December 8, 2015.  Soon after, Plaintiffs sought, and Tire Discounters did not contest, conditional certification of a collective action pursuant to the FLSA's provisions at 29 U.S.C. § 216(b).  (Doc. 18).  On March 1, 2016, the Court conditionally certified the collective comprising "all current and former Service Managers ('SMs') who work or worked for Defendant Tire Discounters, Inc. ('Defendant'), within the United States at any time since December 8, 2012 (the 'Collective')."  (Doc. 21).  Plaintiffs then distributed Court-approved notice of the FLSA collective action to potential members of the Collective.  The FLSA notice period has closed, and a total of 98 SMs (including the two named Plaintiffs) who worked for Tire Discounters around the country have filed consent forms to join the FLSA collective action.  (Docs. 2, 22–32, 34–42).

Contemporaneously, the parties conducted discovery regarding Rule 23 class certification of an Ohio-only class, decertification of the nationwide collective action, and dispositive motions.  The parties agreed that Tire Discounters would be entitled to take the depositions of the two named Plaintiffs as well as eight other opt-in plaintiffs who had consented to join the

FLSA collective action. (Doc. 46, Scheduling Order at 1). However, Tire Discounters chose to depose only the two named Plaintiffs (Justin Lindsey and Matthew Titus) and three opt-in plaintiffs (Scott Mustovich, Wesley Lowe, and Ronald Litton). (Docs. 68-4 through 68-8, Deposition Transcripts). Lindsey, Titus, and Mustovich worked at various Tire Discounters locations in Ohio; Lowe and Litton worked at locations in Kentucky. Tire Discounters' written discovery responses indicated that there are likely at least 124 current or former employees falling within the definition of Plaintiff's proposed Rule 23 Ohio-only class. (Doc. 69-2, Legando Decl. ¶ 6).

## A.    Pending Motions

On March 1, 2017, Tire Discounters filed its Motion to Decertify the FLSA collective action. (Doc. 68). The same day, Plaintiffs filed their Motion for Class Certification of the OMWA claims under Federal Rule of Civil Procedure 23(b)(3) on behalf of those SMs who had worked for Tire Discounters in Ohio. While those motions remained pending, both parties filed motions for summary judgment per the Court's scheduling order on April 24, 2017: Tire Discounters sought summary judgment on liability as to all issues and all plaintiffs (Doc. 79), and Plaintiffs sought partial summary judgment as to the method of calculating damages (Doc. 80).

Finally, after briefing was complete on both summary judgment motions, Plaintiffs filed a motion on June 14, 2017, for Leave to file a Supplemental Brief in support of their Motion for Class Certification and in opposition to Tire Discounters' Motion to Decertify. (Doc. 95). In this motion, Plaintiffs sought leave to address the positions taken by Tire Discounters in its summary judgment briefing, which they assert shed additional light on the class issues central to the Motion to Decertify and Motion for Class Certification. (*Id.* at 2).

**B.      Contents of the record**

Along with authenticated documentary evidence, the parties have submitted the deposition transcripts of James Ward, Tire Discounters' President (Doc. 77-1), the two named Plaintiffs (Lindsey and Titus, Docs. 68-4 and 68-5), and three opt-in plaintiffs (Mustovich, Litton, and Lowe, Docs. 68-6 through 68-8).  Plaintiff also submitted declarations of 11 other opt-in plaintiffs (Allen, Funke, Jarrells, Jenks, Kozusko, Mahoney, Moffett, Orlett, Page, Seifert, and Wyatt, Docs. 71-9 through 71-19) in opposition to the Motion to Decertify, in support of the Motion for Class Certification, and in opposition to Tire Discounters' Motion for Summary Judgment.  Three of these declarants (Funke, Jenks, and Moffett) and two of the deponents (Litton and Lowe) worked as SMs only in Kentucky.  Therefore, the testimony of these five individuals will not be considered on Plaintiffs' Motion for Class Certification, which deals with an Ohio-only proposed class.

As part of their briefing on the Motion for Class Certification and Tire Discounters' Motion for Summary Judgment, Plaintiffs submitted declarations of five additional SMs who worked for Tire Discounters in Ohio during the relevant period but who did not opt in to the FLSA collective action (Downey, Edmonds, Frey, McManus, and Mishler, Docs. 69-9 through 69-11; 69-15 through 69-16). The Court finds it appropriate to consider the declarations of these five SMs in determining all of the pending motions. Even though they did not opt in to the collective action, they have relevant knowledge of their job duties as SMs and the alleged uniform policy to which SMs were subject.  *See Johnson v. Big Lots Stores, Inc.*, No. CIV.A.04-3201, 2008 WL 2191305, at \*3 (E.D. La. Feb. 20, 2008); *Campanelli v. Hershey Co.*, 765 F. Supp. 2d 1185, 1188 n.8 (N.D. Cal. 2011).

Finally, in opposition to Plaintiffs' Motion for Class Certification, Tire Discounters submitted declarations of two SMs who currently work for Tire Discounters in Ohio (Zolnowski

and Roth, Docs. 76-3 and 76-4).  Plaintiffs argue these declarations should be given little weight because "form affidavits gathered by an employer from its current employees are of limited evidentiary value in the FLSA context because of the potential for coercion."  *Myers v. Marietta Mem'l Hosp.*, 201 F. Supp. 3d 884, 892 (S.D. Ohio 2016) (Marbley, J.).  Moreover, the declarations are undated and do not indicate whether Zolnowksi and Roth were SMs during the relevant period.  The Court therefore finds that these declarations have little, if any, significance to any of the pending motions.

## III.    DISCUSSION

Although filed last out of the five pending motions, the Court will address Plaintiff's Motion for Leave to File Supplemental Brief first because it bears on the record to be considered in deciding the Motion to Decertify and Motion for Class Certification.  The Court will then consider Tire Discounters' Motion to Decertify, Plaintiffs' Motion for Class Certification, Tire Discounters' Motion for Summary Judgment, and Plaintiffs' Motion for Partial Summary Judgment in turn.

## IV.    PLAINTIFF'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL BRIEF

This Court's Local Rules provide only for memoranda in support of a motion, memoranda in opposition, and reply memoranda in the normal course.  S.D. Ohio Civ. R.  7.2(a).  Any further memoranda require leave of court based on a showing of good cause.  *Id.*  "Although Rule 7.2(a) does not define what constitutes good cause for filing any additional memoranda, such as a surreply, this Court has consistently held that in order for a party to be given permission to file a sur-reply, the reply brief must raise new grounds that were not presented as part of the movant's initial motion."  *Comtide Holdings, LLC v. Booth Creek Mgmt. Corp.*, No. 207-cv-1190, 2010 WL 4117552, at *4 (S.D. Ohio Oct. 19, 2010) (Kemp, M.J.) (citing *Power Marketing Direct v. Moy*, No. 2:08-cv-826, 2008 WL 4849289 (S.D. Ohio November 6, 2008)

8

(Frost, J.) and *White v. Honda of America Mfg., Inc.*, 191 F.Supp.2d 933, 944 (S.D. Ohio 2002) (Sargus, J.) (holding that the mere fact that a sur-reply might be "helpful" is not enough to justify its filing)).

Here, Plaintiffs argue a supplemental brief is necessary to highlight the inconsistency between Tire Discounters' opposition to class treatment (according to Tire Discounters, each SM's duties would need to be individually evaluated to determine whether that SM was properly exempt) and its request for summary judgment against named Plaintiffs, all opt-in plaintiffs, and all putative Rule 23 class members (according to Tire Discounters, the evidence demonstrates that all SMs were properly exempt). (Doc. 95, Mot. for Leave at 2). But the argument Tire Discounters asserts in its summary judgment briefing—that all SMs are properly exempt— appeared multiple times in Tire Discounters' briefs in support of decertification and in opposition to class certification. Indeed, Plaintiffs complained that by making these arguments, Tire Discounters was prematurely arguing the merits of the case instead of focusing on class issues. (Doc. 71, Pls.' Mem. in Opp. to Mot. to Decertify at 16–17; Doc. 78, Pls.' Reply in Supp. of Mot. for Class Certification at 2).

Thus, Plaintiffs were clearly aware of Tire Discounters' summary judgment position while briefing the class-related motions and could have raised any inconsistency arguments at that time—and, in fact, they did. (Doc. 71, Pls.' Mem. in Opp. to Mot. to Decertify at 15 ("[T]o the extent Defendant suggests the results of the DOL's investigation of one SM are applicable to *all* SMs company-wide, it would be hard pressed to argue that the 98 SMs at issue should not be treated collectively.")). Plaintiffs have therefore not shown good cause for filing their supplemental brief, and their motion to do so is **DENIED**.

## V.     TIRE DISCOUNTERS' MOTION TO DECERTIFY

Tire Discounters seeks to decertify the FLSA collective action because it asserts that the opt-in plaintiffs are not "similarly situated" as required by 29 U.S.C. § 216(b). For the following reasons, the Court agrees.

### A.     Standard for decertification

The lead Plaintiffs bear the burden of showing that the opt-in plaintiffs are similarly situated to the lead Plaintiffs.  *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 584 (6th Cir. 2009).  The FLSA does not define the term "similarly situated," but the Sixth Circuit has instructed the lower courts analyzing decertification motions to consider:

(1)     the factual and employment settings of the individual plaintiffs,

(2)     the different defenses to which the plaintiffs may be subject on an individual basis, and

(3)     the degree of fairness and procedural impact of certifying the action as a collective action.

*Id.*

While conditional certification at the outset of a putative collective action requires only a minimal showing that the collective is similarly situated, plaintiffs must meet a higher standard at the decertification stage that accounts for the facts learned in discovery.  *Monroe v. FTS USA, LLC*, 860 F.3d 389, 402 (6th Cir. 2017).  Plaintiffs generally must produce "more than just allegations and affidavits" demonstrating similarity in order to achieve final certification. *Frye v. Baptist Mem'l Hosp.*, Inc., 495 F. App'x 669, 671–72 (6th Cir. 2012) (quoting *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1261 (11th Cir. 2008)).  However, the Sixth Circuit has also cautioned that the FLSA's "similarly situated" standard "is less stringent" than the "predominance of common questions" inquiry applicable to class certification under Federal Rule of Civil Procedure 23(b)(3).  *O'Brien*, 575 F.3d at 584.

10

Employees who "suffer from a single, FLSA-violating policy" or whose "claims [are] unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct," are similarly situated.  *Monroe*, 860 F.3d at 402, quoting *O'Brien*, 575 at 584–85.  "Where Defendants have demonstrated a formal policy to comply with the law and compensate employees for all time worked, Plaintiffs may satisfy their burden by producing substantial evidence of a *de facto* policy of circumventing the law." *Cornell v. World Wide Bus. Servs. Corp.*, No. 2:14-cv-27, 2015 WL 6662919, at *3 (S.D. Ohio Nov. 2, 2015) (Deavers, M.J.).

Should the Court determine that, after the more rigorous and fact-intensive analysis at the decertification stage, the claimants are similarly situated, "the district court allows the representative action to proceed to trial.  If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice."  *Waggoner v. U.S. Bancorp*, 110 F. Supp. 3d 759, 765 (N.D. Ohio 2015), quoting *Douglas v. GE Energy Reuter Stokes,* No. 1:07-cv-077, 2007 WL 1341779, at *4 (N.D. Ohio Apr. 30, 2007).

**B.     Decertification analysis**

**1.       The executive exemption**

The primary dispute in this case is whether SMs qualify for the executive exemption from the FLSA's overtime provisions.  The Court must therefore determine whether SMs are similarly situated to each other with respect to the elements of the executive exemption.  The exemption applies to any employee:

(1) Compensated on a salary basis at a rate of not less than $455 per week . . .;

(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

> (4) Who has the authority to hire or fire other employees or whose suggestions
> and recommendations as to the hiring, firing, advancement, promotion or any
> other change of status of other employees are given particular weight.

29 C.F.R. § 541.100.

While Plaintiffs need not show at the decertification stage that all opt-in plaintiffs were improperly classified as exempt, Plaintiffs can carry their burden by showing that "the proposed class 'suffer[s] from a single, FLSA-violating policy,' and that 'proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs.'" *Myers*, 201 F. Supp. 3d at 895 (quoting *O'Brien*, 575 F.3d at 585).

At the outset, it is important to distinguish between the duties of the SM position as envisioned by Tire Discounters' senior executives and the duties of the SM position in practice. Tire Discounters created a uniform SM job description and has its SMs undergo uniform training in an effort to create consistency among its one-hundred-plus locations across five states. (Doc. 68-2, Service Manager Job Description; Doc. 68-1, Ward Aff. ¶ 30). In theory, therefore, the primary duties of all SMs should be uniformly focused on supervising, evaluating, and managing the workflow of service technicians and tire technicians as set forth in the SM job description. (Doc. 68-2). Plaintiffs rely on the uniform job description and training programs, along with SMs' uniform classification as exempt and then re-classification as non-exempt, as evidence that the SMs are subject to a "single, FLSA-violating policy." (Doc. 71, Pls.' Mem. in Opp. to Mot. to Decertify at 20).

In support, Plaintiffs cite a number of cases from around the country that, Plaintiffs assert, stand for the proposition that where employees are uniformly classified as exempt, those employees are similarly situated. (Doc. 71, Pls.' Mem. in Opp. to Mot. to Decertify at 27–28). But many of these cases in fact demonstrate that reliance on blanket exemptions is insufficient and that an examination of employees' actual job duties is necessary. *E.g.*, *Morgan*, 551 F.3d at

12

1264 n.46 ("Just because a business classifies all employees in a particular job category as exempt does not mean that those employees are necessarily 'similarly situated' for purposes of a 29 U.S.C. § 216(b) collective action.  Rather, it is necessary to review the actual job duties of those in that job category to determine whether they are similarly situated and whether the exemption defense can be collectively litigated."); *Long v. Epic Sys. Corp.*, No. 15-cv-81-BBC, 2016 WL 4625497, at *6 (W.D. Wis. Sept. 6, 2016) (same, citing *Morgan*); *Judkins v. Southerncare, Inc.*, 74 F. Supp. 3d 1007, 1012 (S.D. Iowa 2015) (noting that "a blanket exemption for a particular group of employees does not eliminate the need to make a factual determination as to whether class members are actually performing similar duties."); *Rivet v. Office Depot, Inc.*, 207 F. Supp. 3d 417, 424 (D.N.J. 2016) (acknowledging that even where uniform policies were in place, the court must examine "the actual work performed by [employees] on a daily basis" to determine whether they were similarly situated); *Venegas v. Glob. Aircraft Serv., Inc.*, 159 F. Supp. 3d 93, 107 (D. Me. 2016) (examining actual business operations to determine whether propriety of classification could be determined with collective proof).  *See also Schaefer v. Indiana Michigan Power Co.*, 358 F.3d 394, 400 (6th Cir. 2004) (in determining whether an employee's job duties fall within an FLSA exemption, courts "focus on evidence regarding the actual day-to-day activities of the employee rather than more general job descriptions contained in resumes, position descriptions, and performance evaluations.").

Indeed, such inquiries into actual employee functions are necessary because of cases like this one.  Plaintiffs gloss over the deposition and declaration testimony establishing that in many cases, SMs' job duties (and the SMs' understanding of their job duties) did not match up with the official job description.  (*E.g.*, Doc. 68-4, Lindsey Dep. at 140–41).  According to the lead Plaintiffs, SMs are no more than glorified salespeople or mechanics that exercise no meaningful

13

authority over the technicians that are nominally under their direction. (Doc. 68-4, Lindsey Dep. at 68–69; Doc. 68-5, Titus Dep. at 82–83). Lead Plaintiff Titus testified that "[r]egardless of what they wrote down in this job description, reality did not speak to that" and "[the job description is] not an accurate description of what most service managers that [I] ever had conversations with did." (Doc. 68-5, Titus Dep. at 84, 136). The heart of Plaintiffs' claim is that, although treated as "executives" for the purposes of their job description and exemption from overtime wages, SMs are in practice non-exempt employees who do not have management as their primary duty. Plaintiffs therefore cannot rely on Tire Discounters' uniform job description and training as evidence of a single FLSA-violating policy applicable to all SMs, because their claims rest on the irrelevance of that policy to SMs' actual employment.

Additionally, the 2016 re-classification of the SM position as non-exempt does not assist the Court's analysis of SMs' actual job duties. The undisputed testimony of Tire Discounters' President establishes that the re-classification was made in response to the Department of Labor's proposed increase in the salary required to qualify for exemption and was completely unrelated to the substantive job duties of SMs. (Doc. 77-1, Ward Dep. at 98, 116).

As a result, the Court must look to the depositions and declarations of SMs to determine whether they are similarly situated with regard to their *de facto* job duties, irrespective of their official title, job description, and exempt classification, as filtered through the lens of the executive exemption.

## 2. Factual and employment settings of the individual plaintiffs

The first factor in the decertification analysis, the factual and employment settings of the individual SMs, considers, "to the extent they are relevant to the case, the plaintiffs' job duties, geographic locations, employer supervision, and compensation." *Monroe*, 860 F.3d at 402. The Court has already determined that SMs are similarly situated as to the salary basis test requiring

14

exempt employees to be paid a salary of at least $455 per week. Employees' factual and employment settings are therefore relevant to this case insofar as they shed light on the job-duty-related elements of the executive exemption: (1) the employee's primary duty is management; (2) the employee directs the work of two or more other employees; and (3) the employee's recommendations as to hiring, promotion, and discipline are given particular weight. 29 C.F.R. § 541.100.

### a.      Management as primary duty

The FLSA regulations define "management" of the enterprise or of a customarily recognized department generally as including, but not limited to:

> interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102. Thus, the Court will examine each of these factors to determine if the SMs' duties, in the aggregate, primarily constitute management duties.

Further, the factors considered in determining whether management constitutes an employee's "primary duty" include:

> the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700.  While the amount of time spent performing a duty is relevant to determining whether the duty is primary, "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." *Id.*  Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. *Id.*

Of those listed in the "management" definition, the following duties are addressed in the record:

### i.       Interviewing, selecting, and training of employees

James Ward, Tire Discounters' President, testified that General Managers (GMs) and SMs would work together to assess potential hiring candidates, that interviews would be conducted by SMs and/or GMs, and that an SM would need the approval of his GM to hire a candidate.  (Doc. 77-1 at 174–78).  The SM deponents reported a range of involvement with interviewing and hiring:

- Lowe reported no involvement in interviewing or hiring recommendations whatsoever.  (Doc. 68-8 at 77–78).

- Titus stated that he "didn't hire people" but that he may have interviewed candidates once or twice at the request of his GM.  (Doc. 68-5 at 78, 132–33).

- Litton sat in on at least half of the interviews for technician positions, but rarely asked questions; he also made recommendations to his GM as to hiring.  (Doc. 68-7 at 131–34).

- Lindsey testified that his GM would ask him to have "conversations" with applicants and report back to the GM, and that his GM sometimes hired people he recommended, but sometimes not.  (Doc. 68-4 at 107–09).

- Mustovich reported a greater level of involvement in selecting new employees, stating that he evaluated written applications, made recommendations to his GM as to which applicants to bring in for interviews, and conducted the interviews of approximately half the individuals hired during his time as SM, but that only

some of his hiring recommendations were followed by his GM.  (Doc. 68-6 at 116–20).

The sixteen declarations by other SMs contain identical statements that the declarants "did not have the authority to make the final decision to hire or fire employees," and four declarants also mentioned that they at least sometimes sat in on interviews. (Docs. 69-11, 69-14, 69-18, 69-20, Decls. of Frey, Mahoney, Page, and Wyatt). The remaining 11 declarants did not participate in interviewing or selecting candidates.

As to training, all SM deponents reported that senior technicians completed much, if not all, of the actual hands-on training for new technicians.  (Doc. 68-4 at 76–77; Doc. 68-5 at 86–87; Doc. 68-6 at 113; Doc. 68-7 at 126–27, 136; Doc. 68-8 at 79).  However, some SMs also provided hands-on training themselves.  (Doc. 68-4, Lindsey Dep. at 76–77; Doc. 68-5, Titus Dep. at 86–87; Doc. 68-6, Mustovich at 113–14).  Some SMs were also responsible for signing off on training certifications after a technician demonstrated a particular capability.  (Doc. 68-6 at 111; Doc. 68-7 at 124–25; Deps. of Mustovich and Litton).  The sixteen SM declarants did not speak to training in their declarations.

Taken together, the Court finds these SM experiences too varied to be "similarly situated" with respect to interviewing, selecting, and training of employees.  Some SMs report no involvement whatsoever with interviewing and training; others report significant involvement.  Those with significant involvement appear to possess responsibilities consistent with SMs' written job description (Doc. 68-2, describing SMs as responsible for "developing" a team of technicians and assisting in their hiring) and with Tire Discounters' President's testimony as to SMs' duties (Doc. 77-1 at 174–78, describing hiring as a collaborative effort between SMs and GMs, with GMs having the final authority over hiring).  But as stated above, Plaintiffs' claims rest on the inconsistencies between the official SM job description and SMs' actual duties.  The

17

deposition and declaration testimony demonstrates those disparities for a non-trivial portion of the Collective.  Because there appears to be no consistency among SMs as to their actual interviewing, selecting, and training of employees, SMs are not similarly situated for this aspect of the management definition.

ii. **Setting and adjusting employees' rates of pay and hours of work**

Nothing in the record indicates that SMs have any involvement in setting the rates of pay for other Tire Discounters employees; SMs are therefore similarly situated in that respect. However, SMs' involvement in scheduling the hours of service and tire technicians again varied widely:

- Lindsey, Titus, Lowe, and nine of the sixteen SM declarants stated they had no involvement in scheduling at all.  (Doc. 68-4 at 70–71, 83; Doc. 68-5 at 126; Doc. 68-8 at 86; Doc. 69-8; Docs. 69-12 through 69-15; Docs. 69-18 and 69-19; Doc. 71-12; Doc. 71-15).

- Litton testified that he created proposed schedules for the technicians, but his GM would accept it, reject it, or just make his own; Litton "can't say for the most part" that his GM followed his proposed schedule.  (Doc. 68-7 at 157–58).

- Two SM declarants stated that they occasionally created a draft schedule at their GM's direction that was subject to finalization by the GM. (Doc. 69-20; Doc. 71-10).

- Mustovich and five of the SM declarants regularly created proposed schedules that were subject to finalization by the GM.  (Doc. 68-6 at 136; Docs. 69-9 through 69-11; Docs. 69-16 and 69-17).  In Mustovich's case, his GM would only very briefly look over the draft schedule (perhaps for five minutes) after Mustovich had spent 45–60 minutes creating it.  (Doc. 68-6 at 136).

Again, the Court finds no consistency among SMs' responsibilities for scheduling to support a finding that they are similarly situated for this prong of the management definition.

iii. **Directing the work of employees**

The SM declarants did not speak to directing the work of technicians. When questioned about directing the work of service and tire technicians, the five SM deponents again gave a

18

broad range of answers. Lindsey reported that he and the technicians "all supervised each other" and that they all reported directly to the GM. (Doc. 68-4 at 68–69, 116). Lindsey might occasionally "request" that a particular technician do a particular job, but could not "force" the technician to do so. (*Id.* at 121, 123). Titus similarly noted that even on the GM's day off, "most of the time we worked it, again as a team. Everyone knew their job. Everyone did their job." (Doc. 68-5 at 97–98). Titus would not direct technicians to do a particular service job; the technicians would simply handle the service tickets in the order they came in. (*Id.* at 106).

In contrast, Mustovich stated that he "in some sense" supervises technicians and manages the workflow of the shop. (Doc. 68-6 at 82, 88). Mustovich would also correct technicians if they made mistakes, and if technicians spotted a problem with a vehicle, they would bring it to Mustovich's attention. (*Id.* at 90–97). Further, Mustovich would redistribute work among the technicians if necessary to meet time commitments to customers. (*Id.* at 157).

Lowe similarly would divide up the work among the technicians to maximize efficiency. (Doc. 68-8 at 41). Lowe would also assign jobs to technicians on days when the GM was not there or when the GM was otherwise occupied. (*Id.* at 67–68). Lowe also observed the performance of technicians who had been paired to work together, and would offer feedback on the pairings to his GM. (*Id.* at 88–89).

Finally, Litton also made decisions about which technicians would perform each service job to maximize efficiency, directed the timing of technician breaks, and was responsible at times for making sure store opening and closing procedures are followed. (Doc. 68-7 at 112–13, 152, 178). Litton also reported that his GM frequently left for the day several hours prior to closing, such that Litton was the only manager in the store for upwards of 24 hours each week. (*Id.* at 187–88).

19

Because some SMs denied directing the work of any other employees, while others routinely made decisions about the technicians' work, the Court finds that SMs are not similarly situated with regard to this aspect of the management definition.

### iv. Appraising employees and recommending promotions or other changes in status

The record is similarly inconsistent as to SMs' roles in recommending promotions. Lindsey, Mustovich, and Litton stated they at least occasionally evaluated and reported back to their GM on technicians' performance. (Doc. 68-4 at 116–17; Doc. 68-6 at 159–60; Doc. 68-7 at 61–62). Additionally, Mustovich, Litton, and Lowe made recommendations regarding promotions to their GMs. (Doc. 68-6 at 146–47; Doc. 68-7 at 145–46; Doc. 68-8 at 125). Titus did not make recommendations to his GM regarding technicians' performance. (Doc. 68-5 at 136–37).

All sixteen SM declarants stated that they "did not have authority to promote employees," but none state whether they had a role short of final authority in recommending promotions. Seven declarants stated they never participated in performance evaluations (Docs. 69-9 through 69-12; Docs. 69-15 and 69-16; and Doc. 71-12), while the remaining nine did not speak to performance evaluations one way or another.

Based on this range of testimony, the Court is not persuaded that SMs are similarly situated as to recommending promotions or other changes in status.

### v. Disciplining employees

A comparatively clearer picture emerges of SMs' involvement in disciplining employees. All SM deponents, as well as Tire Discounters' COO, confirmed that all discipline had to go through Tire Discounters' human resources department and even a GM would need human resources approval prior to issuing discipline. Additionally, Lindsey and Litton reported no

involvement with formal discipline or terminations.  (Doc. 86-4 at 106; Doc. 68-7 at 124).  Titus stated he did not have authority to terminate employees.  (Doc. 68-5 at 99, 133–34).  Mustovich recommended write ups and corrective action to his GM, and filled out termination paperwork for his GM's signature.  (Doc. 68-6 at 100, 107).  Lowe never participated in formal discipline, but did issue verbal corrections to technicians for mistakes and made recommendations regarding discipline that were "sometimes followed" by his GM.  (Doc. 68-8 at 85–86, 104–05, 125).

The sixteen SM declarants did not speak to this prong other than to uniformly state that they had "no independent authority" to discipline employees and "no final authority" to fire employees.

While the deponents and declarants still report a range of involvement with discipline, the range is much narrower than with other items such as interviewing and scheduling.  The Court is satisfied that, as SMs and even GMs uniformly had to involve human resources before issuing discipline, SMs are similarly situated for this prong of the management definition.

### vi.        Determining the techniques to be used

All deponents confirmed that the techniques to be used in servicing vehicles (e.g., for installing winter tires or changing oil) and operating the store locations (e.g., for opening and closing the store) are prescribed by a number of detailed, step-by-step policies that are uniform company-wide.  (Doc. 77-1, Ward Dep. at 209; Doc. 68-6, Mustovich Dep. at 93; Doc. 68-5, Titus Dep. at 92–93; Doc. 68-6, Litton Dep. at 105–06; Doc. 68-8, Lowe Dep. at 125).  While the SM declarants did not speak to these specific policies, neither do they suggest their testimony on this topic would differ from the deponents.  The Court therefore finds that SMs are similarly situated with regard to this prong of the management definition.

###### vii. Determining the type of merchandise to be bought, stocked, and sold

With regard to store inventory, some deponents were responsible for keeping parts in stock or special ordering parts for customers. (Doc. 68-6, Mustovich Dep. at 124–31; Doc. 68-7, Litton Dep. at 109–10, 169–70; Doc. 68-8, Lowe Dep. at 56, 91–92). Other deponents reported having no responsibility for inventory, or only reporting on what was needed to the GM. (Doc. 68-5, Titus Dep. at 122–23; Doc. 68-4, Lindsey Dep. at 95–97). The sixteen SM declarants did not speak to this issue.

Again, roughly half of the SMs engaged in this duty while roughly half did not. The Court therefore finds that SMs are not similarly situated with regard to this aspect of the management definition.

###### viii. Providing for the safety and security of the employees

The only safety policy discussed in the deposition testimony is ensuring that technicians were wearing their safety goggles. Four deponents (Lindsey, Titus, Mustovich, and Lowe) confirmed that they would instruct technicians to put on safety goggles if they observed the technicians working without them. (Doc. 68-4 at 119; Doc. 68-5 at 143; Doc. 68-6 at 152; Doc. 68-8 at 94–95). The sixteen SM deponents did not speak to enforcement of safety policies one way or another. In contrast, Litton claimed that he did not enforce safety requirements because it was a "company-wide habit" that safety "wasn't considered really important." (Doc. 68-7 at 139). But as this claim is refuted by all others who testified on the issue, the Court is satisfied that SMs were similarly situated in terms of providing for the safety of employees.

In sum, SMs are similarly situated for certain aspects of the FLSA's management definition. However, SMs' experiences varied widely in terms of interviewing, scheduling, directing technicians' work, performance evaluation, and determining the parts to be stocked and

sold.  After weighing all of these factors, the Court concludes that SMs are not similarly situated for the purpose of determining whether they have management as a primary duty.

### b.   Directing the work of two or more other employees

The next factor of the executive exemption is whether the employee in question directs the work of two or more other employees.  With the exception of Lindsey, all deponents confirmed that there were at least two technicians working in the shop who were (at least nominally) under the SMs' supervision at all times.  (Doc. 68-5 at 77–78; Doc. 68-6 at 79–80; Doc. 68-7 at 89; Doc. 68-8 at 59).  Lindsey stated there were times when fewer than two technicians were tasked with covering the six service bays at his location, but could not say how often this minimal staffing arrangement occurred.  (Doc. 68-4 at 70, 92).  The sixteen SM declarants did not speak to the number of technicians working in the shop.  Given the uncertainty of Lindsey's testimony on this point in the face of the deponents' otherwise uniform testimony, the Court finds that SMs were similarly situated in regards to the number of employees they oversaw.

However, as discussed *supra*, SMs are not similarly situated as to whether they actually "direct[ed] the work" of the two or more employees they nominally oversaw.  The Court therefore concludes that SMs are not similarly situated for this prong of the executive exemption.

### c.   Recommendations for hiring, promotion, or discipline given particular weight

The final prong of the executive exemption is whether the employees' recommendations for hiring, promotion, or discipline were given particular weight. To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether

- it is part of the employee's job duties to make such suggestions and recommendations;

- the frequency with which such suggestions and recommendations are made or requested; and

- the frequency with which the employee's suggestions and recommendations are relied upon.

29 C.F.R. § 541.105. The regulations also note that "[a]n employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." *Id.*

As discussed *supra*, SMs' participation varied as to the hiring process and recommending promotions. While SMs are similarly situated with regard to their recommendations for discipline, the Court finds that overall, SMs are not similarly situated with regard to the weight given their recommendations for hiring, promotion, or discipline.

All told, the Court's analysis of the three duty-based prongs of the executive exemption (management as a primary duty, directing the work of two other employees, and particular weight given to recommendations as to hiring, promotion, and discipline) paints a picture of disparate and inconsistent job duties across SMs. The factual and employment settings of the SMs therefore weigh in favor of decertification.

### 3. Different defenses to which the plaintiffs may be subject on an individual basis

The second factor of the decertification analysis is whether the plaintiffs may be subject to different defenses on an individual basis. *O'Brien*, 575 F.3d at 584. In this case, the second factor merges with the first (factual and employment settings of the individual plaintiffs) because Plaintiffs' claims turn on the applicability of the executive exemption defense in the first instance. As the Court has determined that the factual and employment settings relevant to the

executive exemption vary widely among SMs, this second factor also weighs in favor of decertification.

### 4.    Fairness and procedural impact of certifying the action as a collective action

The FLSA is a remedial statute that "must not be interpreted or applied in a narrow, grudging manner." *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 144 (6th Cir. 1977).  Thus, when evaluating the third factor of the decertification analysis, courts consider whether continuing the collective action comports with "the policy behind FLSA collective actions and Congress's remedial intent by consolidating many small, related claims of employees for which proceeding individually would be too costly to be practical." *Monroe*, 860 F.3d at 405.  But "the remedial nature of the FLSA, standing alone, does not justify allowing a case to proceed collectively." *Cornell*, 2015 WL 6662919 at *4, quoting *Crawford v. Lexington-Fayette Urban Cty. Gov't*, No. CIV.A. 06-299-JBC, 2008 WL 2885230, at *11 (E.D. Ky. July 22, 2008).  Courts must "balance the cost alleviation enjoyed by individual plaintiffs and any increase in judicial efficiency against the potential harm to defendants and any potential judicial inefficiency." *Id.*

While it is true that individuals need not be *identically* situated in order to proceed in a collective action, there must be some cohesiveness among the employees that would allow for economies of collective treatment.  "Where opt-in plaintiffs have shown that they are similarly situated," decertification deprives plaintiffs "of the benefit of pooling their resources and judicial economy is reduced." *White v. Baptist Mem'l Health Care Corp.*, No. 08-cv-2478, 2011 WL 1883959, at *14 (W.D. Tenn. May 17, 2011), *aff'd*, 699 F.3d 869 (6th Cir. 2012).  But when Plaintiffs are unable to demonstrate that employees are similarly situated, "there is no judicial economy to be gained by allowing their claims to proceed collectively.  The only possible results are unfairness to [the employer] and manageability problems for the Court." *Id.*

25

This case presents the latter scenario.  The facts and circumstances of the SMs' employment, as it relates to the components of the executive exemption, are so varied that no judicial economy would be gained by proceeding as a collective action.  Therefore, as all three components of the decertification standard weigh in Tire Discounters' favor, the Court **GRANTS** Tire Discounters' Motion to Decertify.

## VI.    PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

In addition to seeking to proceed as a collective action for their claims under the FLSA, Plaintiffs also seek to certify their claims under the Ohio Minimum Fair Wage Standards Act ("OMWA") for class treatment under Federal Rule of Civil Procedure 23(b)(3).  Plaintiffs seek to represent the following class of OMWA claimants:

> All Tire Discounters Service Managers who were classified as exempt from overtime, and who worked in Ohio for at least one workweek at any time since December 8, 2013.

(Doc. 69, Pls.' Mot. for Class Cert. at 1).  Tire Discounters' written discovery responses indicated that there are likely at least 124 current or former employees falling within the definition of Plaintiff's proposed Rule 23 Ohio-only class.  (Doc. 69-2, Legando Decl. ¶ 6).

## A.    Standard for class certification

Federal Rule of Civil Procedure 23(a) provides that class action lawsuits may be certified if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)–(4).  In addition to the four requirements set forth in Rule 23(a), the party seeking certification must also demonstrate that it satisfies at least one of the subcategories of Rule 23(b).  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).  Here, Plaintiffs have moved for certification pursuant to Rule 23(b)(3), which dictates that a class action may proceed when "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

District courts have broad discretion in certifying class actions so as long as they exercise such discretion within the framework of Rule 23.  *Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 446 (6th Cir. 2002).  However, a class "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982); *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998).  While the plaintiff's likelihood of ultimate success of his or her claims on the merits is not one of the elements of the "rigorous analysis," "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

**B.    Class certification analysis**

Because Plaintiffs must satisfy all criteria of Rule 23(a) and Rule 23(b)(3), the failure of any one factor is fatal to Plaintiffs' Motion for Class Certification.  It is clear following the Court's determination that the SMs around the country are not "similarly situated" that Plaintiffs also cannot satisfy the more stringent predominance requirement of Rule 23(b)(3), nor the typicality requirement of Rule 23(a)(3).

27

### 1.      Predominance of common questions

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 594 (1997). "To meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 544 (6th Cir. 2012) (quoting *Randleman v. Fid. Nat. Title Ins. Co.*, 646 F.3d 347, 352–53 (6th Cir. 2011)). "Plaintiffs need not prove that every element can be established by classwide proof." *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 468 (6th Cir. 2017) (citing *Bridging Communities Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1124 (6th Cir. 2016), *cert. denied*, No. 16-1336, 2017 WL 1807143 (Oct. 2, 2017)). But the key is to "identify[ ] the substantive issues that will control the outcome"; in other words, courts should "consider how a trial on the merits would be conducted if a class were certified." *Sandusky Wellness Ctr.*, 863 F.3d at 468, (quoting *Gene & Gene, LLC v. BioPay, LLC*, 541 F.3d 318, 326 (5th Cir. 2008)).

Plaintiffs' claims under the OMWA mirror those under the FLSA, because the OMWA incorporates the FLSA's protections for overtime wages. Ohio Rev. Code § 4111.03; 29 U.S.C. § 213(a)(1). Thus, just as with their claims under the FLSA, Plaintiffs will need to establish on a class basis that Ohio SMs were not properly classified as executives exempt from the payment of overtime. But as discussed *supra*, SMs varied so widely in their job duties that determining whether putative class members qualified for the executive exemption would inevitably require the "myriad mini-trials that Rule 23(b)(3) seeks to prevent." *Sandusky Wellness Ctr.*, 863 F.3d at 470. *See also Hughes v. Gulf Interstate Field Servs., Inc.*, No. 2:14-cv-000432, 2015 WL 4112312, at *5 (S.D. Ohio July 7, 2015) (Sargus, C.J.) (holding that "individualized factual inquiries into whether each putative class member is exempt from overtime compensation

requirements forecloses [satisfaction of the less stringent commonality standard of Rule 23(a)(4)]").  Even when removing from consideration the two SM deponents and the three SM declarants who worked for Tire Discounters outside Ohio, significant differences exist among the Ohio SMs' job duties, precluding the predominance of common questions over individual inquiries.

## 2. Typicality

Because of the wide variation among SM job duties, Lindsey and Titus also cannot serve as typical class representatives as required by Rule 23(a)(3).  "A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of the other class members, and if his or her claims are based on the same legal theory." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007).  In other words, typicality is satisfied if the class members' claims are "fairly encompassed by the named plaintiffs' claims." *Sprague v. Gen. Motors Corp.,* 133 F.3d 388, 399 (6th Cir.1998) (en banc) (quoting *Am. Med. Sys.,* 75 F.3d at 1082).  "This requirement insures that the representatives' interests are aligned with the interests of the represented class members so that, by pursuing their own interests, the class representatives also advocate the interests of the class members." *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 852–53 (6th Cir. 2013).

Again, because of the wide range of job duties reported by Ohio SMs, Lindsey's and Titus's claims do not appear to be typical of those of the proposed class.  For instance:

- Lindsey was the only SM deponent to deny overseeing at least two technicians at all times.  (Doc. 68-4 at 70, 92).

- Lindsey and Titus both denied ever being involved in scheduling, in contrast to Mustovich and five Ohio SM declarants who reported regularly creating a proposed schedule for the GM's approval.  (Doc. 68-4 at 70–71, 83; Doc. 68-5 at 126; Doc. 68-6 at 136; Docs. 69-9 through 69-11; Docs. 69-16 and 69-17).

- Lindsey and Titus both occasionally sat in on interviews (or had "conversations") with job applicants, as did Mustovich and four Ohio SM declarants; but eight Ohio SM declarants reported no involvement with interviews or candidate selection. (Doc. 68-4 at 107–09; Doc. 68-5 at 78, 132–33; Doc. 68-6 at 116–20; Docs. 69-11 through 69-20).

- Titus did not make recommendations to his GM regarding technicians' performance, whereas Lindsey and Mustovich stated they at least occasionally evaluated and reported back to their GM on technicians' performance. (Doc. 68-5 at 136–37; Doc. 68-4 at 116–17; Doc. 68-6 at 159–60).

Evaluation of these job duties will be critical to determining whether SMs were properly classified as exempt. As Lindsey's and Titus's job duties are not typical of other Ohio SMs, their claims cannot be said to be typical of the claims of the class. Fed. R. Civ. P. 23(a)(3).

Because Plaintiffs cannot satisfy the predominance or typicality requirements of Rule 23, the Court need not determine whether the other Rule 23 requirements are satisfied. The Court therefore **DENIES** Plaintiffs' Motion for Class Certification.

## VII.    TIRE DISCOUNTERS' MOTION FOR SUMMARY JUDGMENT

Tire Discounters seeks summary judgment as to the lead Plaintiffs, as well as the opt-in plaintiffs in the FLSA collective action and the members of the putative Ohio-only Rule 23 class. (Doc. 79, Mot. for Summ. J. at 1). Because the FLSA collective action has been decertified, and the OMWA claims cannot be certified for class treatment, the only remaining claims before the Court are those of lead Plaintiffs Lindsey and Titus.

### A.    Standard for summary judgment

Tire Discounters moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 716–17 (6th Cir. 2012). The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and

determine the truth of the matter" but to "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the nonmoving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id.* at 249–50.

The party seeking summary judgment shoulders the initial burden of presenting the court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (after burden shifts, nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury").

In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). But self-serving affidavits alone are not enough to create an issue of fact sufficient to survive summary judgment. *Johnson v. Washington Cty. Career Ctr.*, 982 F. Supp. 2d 779, 788 (S.D. Ohio 2013) (Marbley, J.). "The mere existence of a scintilla of evidence to support [the non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Anderson,* 477 U.S. at 251.

31

**B.**      **Summary judgment analysis**

To decide Tire Discounters' summary judgment motion, the Court must again examine the components of the executive exemption as they apply to both Lindsey and Titus.   Tire Discounters is entitled to summary judgment only if it can show, when construing disputed facts in favor of Plaintiffs, that Lindsey's and Titus's salary and job duties qualified for the executive exemption from the FLSA's and OMWA's overtime provisions.   Specifically, Tire Discounters must demonstrate that both Lindsey and Titus

> (1) were compensated on a salary basis at a rate of not less than $455 per week;
>
> (2) had, as their primary duty, management of the enterprise in which the employee was employed or of a customarily recognized department or subdivision thereof;
>
> (3) customarily and regularly directed the work of two or more other employees; and
>
> (4) had the authority to hire or fire other employees or their suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees were given particular weight.

29 C.F.R. § 541.100.   In evaluating the executive exemption, the Court may not rely on Tire Discounters' official SM job description, but must examine the actual facts and circumstances of Plaintiffs' employment.   *Schaefer*, 358 F.3d at 400.   For the following reasons, the Court finds that issues of disputed fact as to Lindsey's and Titus's job duties preclude summary judgment.

**1.**      **Salary basis test**

Before review of Plaintiffs' job duties, the executive exemption requires that such employees be paid a salary of at least $455 per week.   Titus testified that his annual salary as an SM was $35,000 per year (which equates to $673.08 per week).   (Doc. 68-5 at 63).   Lindsey recalled his initial SM salary as $450 per week (Doc. 68-4 at 46), but Tire Discounters' records demonstrate that he was in fact paid at least $535 per week during his entire tenure as an SM.

(Doc. 79-1, Pay Records). Lindsey further stated that if Tire Discounters' records showed a salary higher than what he recalled, he wouldn't have any basis to dispute the records. (Doc. 68-4 at 46–47). The salary basis test is therefore met for both Lindsey and Titus.

### 2.    Management as primary duty

As discussed *supra*, the FLSA regulations set forth a number of factors relevant to whether an employee has management as a primary duty. Of those factors, Lindsey and Titus both stated they occasionally interviewed (or had "conversations" with) job applicants; they both enforced safety policies in terms of making sure technicians were wearing protective goggles; and Lindsey at least occasionally evaluated and reported on technicians' performance. (Doc. 68-4 at 107–09, 116–17, 119; Doc. 68-5 at 132–33, 143). However, the remaining factors demonstrate that there are genuine issues of fact as to Plaintiffs' management duties.

Neither Lindsey nor Titus had any involvement in setting the rates of pay or schedules for other Tire Discounters employees. (Doc. 68-4 at 70–71, 83; Doc. 68-5 at 126). Titus did not make recommendations to his GM regarding technicians' performance or participate in hiring, and even when Lindsey made hiring recommendations, his GM would only sometimes follow them. (Doc. 68-5 at 78, 136–37; Doc. 68-4 at 107–09). Titus reported having no responsibility whatsoever for deciding which parts to stock or sell, and Lindsey only reported what parts or tires were needed to the GM. (Doc. 68-5 at 122–23; Doc. 68-4 at 95–97). Neither determined the techniques to be used in servicing vehicles (e.g., for installing winter tires or changing oil) and operating the store locations (e.g., for opening and closing the store), which were prescribed by a number of detailed, step-by-step policies that are uniform company-wide. (Doc. 77-1, Ward Dep. at 209; Doc. 68-5, Titus Dep. at 92–93). Further, as with all SMs, neither Lindsey nor Titus could issue discipline without obtaining approval from human resources, and neither reported involvement with formal discipline. (Doc. 86-4 at 106; Doc. 68-5 at 99, 133–34).

Notably, both Lindsey and Titus denied acting as a supervisor or manager to the shop technicians. Lindsey reported that he "felt like [he] had no supervisory responsibilities whatsoever" and that he and the technicians all reported directly to the GM. (Doc. 68-4 at 68–69, 116). Lindsey might occasionally "request" that a particular technician do a particular job, but could not "force" the technician to do so. (*Id.* at 121, 123). Titus similarly noted that even on the GM's day off, "most of the time we worked it, again as a team. Everyone knew their job. Everyone did their job." (Doc. 68-5 at 97–98). Titus would not direct technicians to do a particular service job; the technicians would simply handle the service tickets in the order they came in. (*Id.* at 106).

The work experience described by Lindsey and Titus does not rise to the level of employees engaged in management as their primary duty. As the Court must credit their testimony at the summary judgment stage, Plaintiffs have demonstrated a triable issue of fact.

### 3.    Directing the work of two or more employees

The next factor of the executive exemption is whether the employee in question directs the work of two or more other employees. Titus confirmed that there were at least two technicians working in the shop who were (at least nominally) under his supervision at all times. (Doc. 68-5 at 77–78). Lindsey stated there were times when fewer than two technicians were tasked with covering the six service bays at his location, but could not say how often this minimal staffing arrangement occurred. (Doc. 68-4 at 70, 92). But the precise number of technicians working at any given time is irrelevant if Lindsey and Titus did not direct the technicians' work. And, as just summarized, they did not. (Doc. 68-4 at 68–69, 116, 121, 123; Doc. 68-5 at 97–98, 106). Tire Discounters has therefore failed to carry its burden on this component of the executive exemption.

4. **Recommendations for hiring, promotion, or discipline given particular weight**

Finally, the Court must determine whether Plaintiffs' recommendations for hiring, promotion, or discipline given particular weight.  Based on the Plaintiffs' testimony, the Court answers this inquiry in the negative.

Lindsey stated he occasionally had conversations with job applicants and reported to his GM regarding technicians' performance; but his recommendations to his GM were only sometimes followed.  (Doc. 68-4 at 107–09, 116–17).  Titus did not make recommendations to his GM regarding technicians' performance or participate in hiring.  (Doc. 68-5 at 78, 132–33, 136–37).  Further, as with all SMs, neither Lindsey nor Titus could issue discipline without obtaining approval from human resources, and neither reported involvement with formal discipline.  (Doc. 86-4 at 106; Doc. 68-5 at 99, 133–34).

In sum, while Tire Discounters has demonstrated with uncontroverted fact that both Lindsey and Titus met the salary basis test of the executive exemption, there are numerous disputed facts as to their relevant job duties.  The Court thus cannot conclude that Lindsey and Titus were properly classified as exempt from the overtime provisions of the FLSA and OMWA. Tire Discounters' Motion for Summary Judgment is accordingly **DENIED**.

## VIII.   PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Should Plaintiffs prevail on their misclassification claims, they will be entitled to unpaid overtime wages.  The FLSA generally requires employers to pay "overtime compensation for hours of work exceeding 40 hours in a workweek at a rate of one and one-half times an employee's regular rate of pay."  *Lewis v. Huntington Nat'l Bank*, 838 F.Supp.2d 703 (S.D. Ohio 2012) (citing 29 U.S.C. §§ 206(a), 207(a)(1)).  The OMWA contains the same general requirement for payment of overtime.  Ohio Rev. Code § 4111.03(A).

Plaintiffs move for partial summary judgment on two issues related to the calculation of damages, should Plaintiffs prevail on liability.  First, Plaintiffs seek a ruling that they should be awarded unpaid overtime at a rate of time-and-a-half their regular hourly rates for each hour worked in excess of 40 hours each work week (as opposed to the "fluctuating work week method" advanced by Tire Discounters).  (Doc. 80, Pls.' Mot. for Partial Summ. J. at 1–2).  Second, Plaintiffs seek a ruling that their regular hourly rates should be determined by dividing their weekly, non-discretionary compensation by the number of hours they expected to be regularly scheduled to work each week, which Plaintiffs assert was 52 (versus 54 as argued by Tire Discounters).  (*Id.* at 1, 11).[2]

## A.      Standard for partial summary judgment

The standard applicable to motions for full summary judgment described *supra* also applies to motions for partial summary judgment.  Fed. R. Civ. P. 56(a).  The Court will therefore determine whether any genuine issues of material fact exist as to the two damages issues, and, if not, whether Plaintiffs are entitled to judgment as a matter of law.

## B.      Partial summary judgment analysis

### 1.      Method of damages calculation

The parties offer conflicting methods of calculating unpaid overtime wages for employees improperly classified as exempt.  Plaintiffs argue, consistent with the FLSA's language, that such employees are entitled to unpaid overtime at time-and-a-half (that is, 150% of an employee's regular hourly rate) for all hours in excess of 40 worked in a work week.  29 U.S.C. § 207(a).  Tire Discounters, in contrasts, argues that Plaintiffs' damages should be

---

[2] Plaintiffs assert that SMs were generally scheduled to work 48.5 hours per week beginning in October 2015. However, only Lindsey's and Titus's claims remain before the Court, and both left their SM positions prior to October 2015.

calculated according to the fluctuating work week ("FWW") method.  (Doc. 88, Mem. in Opp. to Mot. for Partial Summ. J. at 1).

The FWW provides a compensation scheme that employers may use to calculate overtime pay for nonexempt employees.  *Snodgrass v. Bob Evans Farms, LLC*, No. 2:12-cv-768, 2015 WL 1246640, at *6 (S.D. Ohio Mar. 18, 2015) (Economus, J.).  The FWW method was first explained by the Supreme Court in *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572 (1942), and later codified in the FLSA's regulations.  29 C.F.R. § 778.114.  To take advantage of this alternative overtime compensation scheme, an employer must establish the following elements:

> (1) the employee's hours must fluctuate from week to week;
>
> (2) the employee must receive a fixed salary that does not vary with the number of hours worked during the week (excluding overtime premiums);
>
> (3) the fixed amount must be sufficient to provide compensation every week at a regular rate that is at least equal to the minimum wage; and
>
> (4) the employer and employee must share a "clear mutual understanding" that the employer will pay that fixed salary (apart from overtime premiums) regardless of the number of hours worked.

*Id.*; *Snodgrass*, 2015 WL 1246640 at *9.  The Sixth Circuit has determined that the FWW does not violate the FLSA so long as these requirements are met. *See Highlander v. K.F.C. Nat. Mgmt. Co.*, 805 F.2d 644, 647 (6th Cir. 1986).

If the FWW method is used, the employee's regular hourly rate is calculated each week by dividing the fixed weekly salary by the number of hours actually worked that week.  *Id.* at *6. The employee then receives a premium on top of the fixed salary representing 50% of the regular hourly rate for all hours worked that week in excess of 40.  *Id.*  The regulations provide a helpful illustration:

The application of the principles above stated may be illustrated by the case of an employee whose hours of work do not customarily follow a regular schedule but vary from week to week, whose total weekly hours of work never exceed 50 hours in a workweek, and whose salary of $600 a week is paid with the understanding that it constitutes the employee's compensation, except for overtime premiums, for whatever hours are worked in the workweek. If during the course of 4 weeks this employee works 40, 37.5, 50, and 48 hours, the regular hourly rate of pay in each of these weeks is $15.00, $16.00, $12.00, and $12.50, respectively. Since the employee has already received straight-time compensation on a salary basis for all hours worked, only additional half-time pay is due. For the first week the employee is entitled to be paid $600; for the second week $600.00; for the third week $660 ($600 plus 10 hours at $6.00 or 40 hours at $12.00 plus 10 hours at $18.00); for the fourth week $650 ($600 plus 8 hours at $6.25, or 40 hours at $12.50 plus 8 hours at $18.75).

29 C.F.R. § 778.114(b).

Both *Missel* and § 778.114 consider FWW in the context of contemporaneous payment of overtime wages and are silent on the application of the FWW method to retroactively calculate overtime damages in a misclassification case.  Nor has the Sixth Circuit considered the issue. However, Judge Economus of this District recently delivered a thorough and well-reasoned opinion rejecting the use of the FWW method in misclassification cases in *Snodgrass v. Bob Evans Farms, LLC*.

*Snodgrass* presented the same two competing methods of calculating damages for improper exempt classification: time-and-a-half versus FWW.  The *Snodgrass* court reviewed the origins of the FWW in *Missel* and the Code of Federal Regulations, and collected numerous cases from this Circuit and around the country holding that the FWW method cannot be used to calculate damages in a misclassification case.  2015 WL 1246640 at *7.  While recognizing that the FWW method may be agreed to between the employer and employee to calculate wages on a forward-looking basis, the *Snodgrass* court determined that its retroactive application in misclassification cases is inappropriate as a matter of law.  *Id.* at *8.

Neither exempt employees, nor their employers, expect those employees to receive overtime wages; therefore, there can be no required "clear mutual understanding" that overtime wages would be calculated with the FWW method.  Indeed, the FWW method sets forth a framework for calculating compensation for *non-exempt* employees.  29 C.F.R. § 778.114.  "If [Tire Discounters] believed that [Plaintiffs were] exempt from section 207(a), such that [they were] entitled to no overtime compensation, then it was not possible for it to have had a clear mutual understanding with [Plaintiffs] that [they were] subject to a calculation method applicable only to non-exempt employees who are entitled to overtime compensation."  *Cowan v. Treetop Enterprises*, 163 F. Supp. 2d 930, 942 (M.D. Tenn. 2001) (quoting *Rainey v. Am. Forest & Paper Ass'n, Inc.*, 26 F. Supp. 2d 82, 102 (D.D.C. 1998).  Thus, the FWW requirements codified at § 778.114 "can never be satisfied in a misclassification case."  *Snodgrass*, 2015 WL 1246640 at *9.

The Court agrees with Judge Economus's analysis in *Snodgrass*, and therefore holds that the FWW method may not be used to retroactively calculate damages for unpaid overtime wages in a misclassification case.  To that extent, Plaintiffs' Motion for Partial Summary Judgment is **GRANTED**.

### 2.    Divisor for calculating Plaintiffs' regular hourly rate

Because the FWW method cannot be used to calculated unpaid overtime wages, should Plaintiffs prevail on their misclassification claims, they will be entitled to overtime wages calculated with the following function:  R x 1.5 x H = OT, where R = regular hourly rate of pay, H = hours worked in a week over 40, and OT = overtime. [3]  *Snodgrass*, 2015 WL 1246640 at *5.

---

[3] Tire Discounters briefly argues that the overtime premium should be applicable only to hours worked in excess of Plaintiffs' regularly scheduled hours (according to Tire Discounters, 54 per week), rather than all hours worked in excess of 40 per week.  While Tire Discounters is correct that this was the calculation employed in *Cowan,* 163 F. Supp. 2d at 939, this was clear error by the *Cowan* court—the FLSA statute and regulations, as well as the OMWA,

In order to determine the regular hourly rate of pay, "the Court divides the total compensation in any given pay period by the total hours of work for which the payment is made, consistent with the language of 29 C.F.R. § 778.308." *Id.* at 15 (quoting *Cook v. Carestar, Inc.*, No. 2:11-cv-00691, 2013 WL 5477148, at *11 (S.D. Ohio Sept. 16, 2013) (Marbley, J.)).

Both parties agree that, in the event the FWW method is not used, the appropriate divisor of Plaintiffs' weekly compensation to determine their regularly hourly rate is the number of hours Plaintiffs expected to work. (Doc. 80, Pls.' Mot. for Summ. J. at 1; Doc. 88, Tire Discounters' Mem. in Opp. to Pls.' Mot. for Partial Summ. J. at 4). *See also Cook v. Carestar, Inc.*, No. 2:11-cv-00691, 2013 WL 5477148, at *11 (S.D. Ohio Sept. 16, 2013) (Marbley, J.) (calculating unpaid overtime wages in a misclassification case by dividing the total compensation in any given pay period by "the number of hours per week plaintiff was aware he would be working") (citing *Fegley v. Higgins*, 19 F.3d 1126, 1129–30 (6th Cir. 1994)).

The parties disagree, however, on the number of hours that Plaintiffs expected to work. Plaintiffs assert, based on Tire Discounters' President's deposition testimony, that SMs were "generally" scheduled to work 52 hours per week. (Doc. 90, Pls.' Reply in Supp. of Partial Summ. J. at 6) (quoting Doc. 77-1, Ward Dep. at 180–81). Tire Discounters asserts that SMs were in fact generally expected to work 54 hours per week, citing the offer letters issued to Litton and Lowe that stated their weekly salary was "based on a scheduled 54 hour work week." (Doc. 88, Tire Discounters' Mem. in Opp. at 2; Doc. 68-7, Ex. 6; Doc. 68-8, Ex. 2).

The Court is unable to resolve the precise number of hours that Lindsey and Titus expected to work each week at the summary judgment stage. Because of the procedural posture

---

make it clear that overtime must be paid on all hours worked per week over 40. 29 U.S.C. § 207(a); 29 C.F.R. § 778.101; Ohio Rev. Code § 4111.03(A). As pointed out by Plaintiff, employees cannot agree to waive their right to overtime pay even when they understand their base salary to compensate for more than 40 hours per week. *Snodgrass*, 2015 WL 1246640 at *12. Accordingly, overtime must be paid on all hours worked in excess of 40 per week.

of the case at the time Plaintiffs filed their Motion for Partial Summary Judgment, both parties briefed this issue on the assumption that the Court would be deciding how many hours SMs were generally scheduled to work on a collective basis.  However, only Lindsey's and Titus's claims are currently before the Court, and no party has presented evidence as to the number of hours these two individuals expected to work.  And because SMs are not similarly situated, the Court is not persuaded that evidence of SMs' schedules "generally" will be accurate as to Lindsey and Titus.

Accordingly, to the extent Plaintiffs seek a determination of the particular number of hours to be used as the divisor of Lindsey's and Titus's weekly compensation to determine their regular hourly rate, Plaintiffs' Motion for Partial Summary Judgment is **DENIED**.

## IX.    CONCLUSION

For the foregoing reasons,

(1) Tire Discounters' Motion to Decertify is **GRANTED**. The claims of all opt-in plaintiffs, excluding lead Plaintiffs Lindsey and Titus, are **DISMISSED WITHOUT PREJUDICE**;

(2) Plaintiffs' Motion for Class Certification is **DENIED**;

(3) Tire Discounters' Motion for Summary Judgment is **DENIED**;

(4) Plaintiffs' Motion for Partial Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**; and

(5) Plaintiffs' Motion for Leave to File a Supplemental Brief is **DENIED**.

The Court further recommends that the parties engage in mediation to resolve the claims of Lindsey and Titus.   If the parties wish to participate in mediation, they may contact Judge Jolson's chambers at (614) 719-3470 to schedule a mediation through the Court.

The Clerk shall remove Documents 68, 69, 79, 80, and 95 from the Court's pending motions list.

41

**IT IS SO ORDERED.**

      */s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**